US DISTRICT COURT INDEX SHEET

















HBH     10/20/05

3:03-CV-2234 ASSET MARKETING V. GAGNON

*89*

*OPPM.*



ORIGINAL

1  TODD A. MOORE (State Bar No. 214474)
   Attorney at Law
2  444 West "C" Street, Suite 210
   San Diego, California 92101
3  Tel: (619)238-1111
4  Fax: (619)238-1126

FILED

05 OCT 19 PH 3: 40

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____ DEPUTY

5  Counsel for Defendants Kevin Gagnon, Mister Computer;
6  Counter Complainant and Counter-Counterdefendant
   Kevin Gagnon, dba Mister Computer

NUNC PRO TUNC

OCT 12 2005

7

8              UNITED STATES DISTRICT COURT

9           SOUTHERN DISTRICT OF CALIFORNIA

10

11  ASSET MARKETING SYSTEMS, INC.,     )  Case No.: 03-CV-02234-J(JFS)
                                       )
12              Plaintiff,             )  MEMORANDUM OF POINTS AND
                                       )  AUTHORITIES IN SUPPORT OF KEVIN
13          -v-                        )  GAGNON'S OPPOSITION TO MOTION FOR
                                       )  SUMMARY JUDGMENT OR, IN THE
14  KEVIN GAGNON; MISTER COMPUTER;     )  ALTERNATIVE, PARTIAL SUMMARY
15  NATIONAL MARKETING TECHNOLOGIES,   )  JUDGEMENT FILED BY ASSET
    INC.; STEVEN SCHMIDT; BEN NYE; DOES 1- )  MARKETING SYSTEMS, INC.
16  10, Inclusive,                     )
                                       )
17              Defendants.            )  Date:    October 24, 2005
                                       )  Time:    10:30 a.m.
18  _____)  Dept.    12 (Second Floor)
19  AND RELATED COUNTERCLAIMS          )  Judge:   Hon. Napoleon A. Jones, Jr.
    _____)

20

21

22

23

24

25

26

27

28

89

# TABLE OF CONTENTS

I.      INTRODUCTION........................................................................................1

II.     FACTUAL BACKGROUND........................................................................2

III.    LEGAL STANDARD FOR SUMMARY JUDGEMENT.........................................3

IV.     ARGUMENT..........................................................................................4

        1.      As The Author of The M.C. Programs, Mr. Gagnon Owns
                The Copyright to the Programs...........................................................4

                A.      Mr. Gagnon Was an Independent Contractor To AMS and
                        As Such, His Programs Cannot Be Considered Works Prepared
                        By an Employee in The Scope of Employment..............................5

                B.      Mr. Gagnon's Programs Were Not Specially Ordered For Use In Any of The
                        Enumerated Categories Contained in 17 U.S.C.S § 101 (A)(2)......................6

        2.      Mr. Gagnon Did Not Assign or Transfer His Copyright to AMS.............................8

                A.      There is Undisputable Evidence And Suspicious Circumstances
                        Surrounding The Creation of The Vendor Nondisclosure Agreement
                        Allegedly Signed By Mr. Gagnon Creating Genuine
                        Issues of Material Fact.......................................................................8

                B.      The Alleged Signature of Mr. Gagnon on The Vendor Nondisclosure
                        Agreement Cannot Be Authenticated...................................................13

        3.      Assuming *Arguendo*, The Court Finds The Vendor Nondisclosure
                Agreement To Be        Genuine, The Agreement's Effective Date Precludes it
                From Being a Transfer of Mr. Gagnon's Copyright
                Pursuant To 17 U.S.C.S. § 204(a)...............................................................14

        4.      A Finding By This Court Granting AMS An Implied License to Use Mr. Gagnon's
                Programs Would In Effect Be Granting AMS A License to Steal............................16

        5.      AMS' Remaining Arguments Cannot Be Established
                As A Matter of Law and Therefore Must Be Rejected in
                The Context of Summary Judgment.......................................................20

V.      CONCLUSION.........................................................................................21

# TABLE OF AUTHORITES

**Cases**

(*Alcatel USA, Inc. v Cisco Sys.* (2002, ED Tex) 239 F Supp 2d 645.) ..........................................9

*Celotex Corp.* v. *Catrett* (1986) 477 U.S. 317 ..........................................................6

*Cf. Community for Creative Non-Violence v. Reid*, 490 U.S. 730 ..........................................16

*Dominguez-Curry v. Nev. Transp. Dep't*, (9th Cir. 2005) 2005 U.S. App. LEXIS 19764) ....................6

*Dumas v. Gommerman* (9th Cir. 1989), 865 F.2d 1093 ......................................................16

*Effects Associates, Inc. v. Cohen* (9th Cir. 1990), 908 F. 555 ..........................................19

*Effects Assocs., Inc. v. Cohen* (9th Cir. 1990), 908 F.2d 555 ..........................................16

*Foad Consulting Group, Inc. V. Musil Azzalino* (9th Cir. 2001) 270 F.2d, 821 ............................19

*Graham v James* (1998, CA2 NY) 144 F3d 229) ..............................................................9

*I.A.E., Inc. v. Shaver* 74 F.3d 768 ....................................................................19

Konigsberg Int'l. Inc. v. Rice (9th Cir. 1994), 16 F.3d 355 ............................................16

*Neal v. State Farm Ins. Co.* (Ct. App. 1961), 188 Cal. App. 2d 690. ....................................17

*Radio TV Espanola S.A. v New World Entertainment, Ltd.* (9th Cir. 1999), 183 F.3d 922 ..................16

*Valente-Kritzer Video v. Pinckney* (9th Cir. 1989), 881 F.2d 772 ......................................16

*Whelan Associates, Inc. v Jaslow Dental Laboratory, Inc.* (1985, ED Pa) 609 F Supp 1307 ................9

**Statutes**

17 U.S.C.S § 101 ..........................................................................................7

17 U.S.C.S § 101 (A)(2) ....................................................................................9

17 U.S.C.S § 201 ..........................................................................................7

17 U.S.C.S §. 201(d) ......................................................................................15

U.S.C.S. § 204(a) ........................................................................................15

**Rules**

F.R.Civ.P., Rule 56(c) ....................................................................................6

# I.

## **INTRODUCTION**

The core issue before the court is the ownership of the copyright to the programs at the center of this lawsuit. AMS claims it owns the copyright on two different theories. First it claims the programs are works made for hire, an argument that is not addressed in AMS' current motion. Second, AMS now claims out right ownership of the programs as a result of the Vendor Nondisclosure Agreement allegedly signed by Mr. Gagnon, giving all copyright to AMS. As detailed below, there are material issues of fact yet to be resolved.

AMS' Motion for Summary Judgment (hereinafter MSJ) attacks all of Mr. Gagnon's claims as set forth in Mr. Gagnon's counterclaim. AMS supports its motion with a memorandum in support thereof (hereinafter MSJ) containing six arguments identified alphabetically A through F. AMS asserts in its first argument that Mr. Gagnon's copyright claim lacks merit because it either owns the programs in question via the Vendor Nondisclosure Agreement allegedly signed by Mr. Gagnon, or at a minimum, has an implied license to use the programs as a matter of law. AMS' remaining five arguments are all premised on the validity of its first argument. If AMS' first argument fails, then so do the remaining five.

Mr. Gagnon asserts AMS' first argument lacks merit based on the existence of undisputable physical evidence that directly contradicts the evidence put forward by AMS and raises material issues of fact to be resolved only by the trier of fact. Furthermore, the court cannot find based on the conduct of the parties that AMS has an implied license. Based on the conduct of AMS, a finding by the court giving AMS an implied license would in effect be giving AMS a license to steal. Consequently, this Court cannot find any of AMS' remaining five arguments valid as a matter of law and therefore must deny AMS' Motion for Summary Judgment in its entirety.

# II.

## **FACTUAL BACKGROUND**

Kevin Gagnon dba Mister Computer, (hereinafter Mr.Gagnon) is a software architect and systems analyst with a strong background in computer hardware and networking. In 1999, Mr. Gagnon was introduced to an individual by the name Richard Metcalfe. Mr. Metcalfe at that time was doing business as a sole proprietor, Asset Marketing Systems. (hereinafter AMS.) AMS provided marketing

1  assistance to insurance agents and financial advisors. AMS retained the services of Mr. Gagnon, as an

2  outside vendor and independent contractor, to analyze, design, and provide software solutions for AMS.

3      Between 1999 and April 2003, AMS' business and its demand for Mr. Gagnon's services grew

4  rapidly. AMS would consult with Mr. Gagnon, advise him of its business goals, strategies, and/or

5  objectives, and Mr. Gagnon would design computer software to assist AMS in accomplishing its

6  management goals. Specifically, without limitation, Mr. Gagnon's original computer software designs

7  were used by AMS for managing its network, operations, establishment of email and internet accounts,

8  systems for security, installation and management of network servers, development of back-up systems

9  and tools, antivirus installation and management, cabling, telephone management, and documentation

10  relating to the foregoing. (See declaration of Kevin Gagnon filed herewith.)

11      During the course of the relationship between Mr. Gagnon and AMS, Mr. Gagnon authored the

12  following copyrighted computer programs (hereinafter M.C. Programs): Document Retrieval System

13  (DRS); Telephone Monitoring System (TMS); Territorial Administration System (TAS); Territory

14  Identification and Design (Territory ID); Telelogix; and Production Entry. At all times mentioned herein,

15  there was an implied agreement between Mr. Gagnon and AMS that the M.C. Programs were authored

16  exclusively by Mr. Gagnon and were the sole and separate property of Mr. Gagnon, dba MISTER

17  COMPUTER. Each computer program displayed a "copyright Mister Computer" splash screen. Mr.

18  Gagnon has registered each copyright with the U. S. Copyright Office. AMS never received a copy of the

19  M.C. Programs or user any manuals. (See declaration of Kevin Gagnon filed herewith; **Exhibits 2,and**

20  **3.[1]**)

21      The M.C. Programs resided on the AMS computers in what are known as program executable

22  files. The M.C. Programs were installed and modified by Mr. Gagnon and/or his employees. Each M.C.

23  Program was tailored specifically for the computer it resided on. The M.C. Programs were secure in this

24  environment because of their design. The M.C. Programs could not be easily copied from one machine

25  and installed on another; to do so would require an extremely skilled programmer. The programmer

26  would have to decompile the program executable files in to open source code and then determine the how

27

28  [1]

All Exhibits referenced herein are contained in Kevin Gagnon's Lodgment of Exhibits in Opposition to Motion for Summary Judgment or, In the Alternative, Partial Summary Judgment Filed By Asset Marketing Systems, Inc.

1    the program was designed to function. (See declaration of Kevin Gagnon filed herewith.)

2    Up until Mr. Gagnon hired and trained his first employee for programming at AMS, he controlled

3    the open source code for the programs exclusively.  Once he had trained an employee as a programmer,

4    they would be responsible for maintaining open source code.  Each employee signed an employee

5    agreement containing confidentiality clause as well an acknowledgement that all intellectual property was

6    to be the property of Mr. Gagnon. Mr. Gagnon hired 10 employees to help with the service he provided

7    AMS.

8    During the course of the relationship between AMS and Mr. Gagnon, AMS on two occasions

9    asked Mr. Gagnon to become an employee offering as much as $250,000.00 a year in salary, but Mr.

10    Gagnon refused.  AMS' motivation was to make Mr. Gagnon an employee so that all of his copyright and

11    proprietary trade secrets, including the M.C. Programs and their source code would become the property

12    of AMS as works made for hire.  AMS continues to intimate that all of the M.C. Programs are works for

13    hire and the property of AMS.

14    In June of 2003, Mr. Gagnon rejected another employment offer from AMS. The parties then

15    began to create an exit strategy for Mr. Gagnon and his employees. During this time, AMS' COO, Jay

16    Akerstein, and Mr. Gagnon attempted to resolve their differences.  On August 5, 2003, in a letter to Mr.

17    Akerstein,  Mr. Gagnon clearly spelled out his position with respect to the retention of his employees and

18    the ownership of the M.C. Programs. (**Exhibit H.**)  Mr. Gagnon made it clear that he owned the software

19    and that he would hold his employees to there contract provisions; mainly that they could not go to work

20    for AMS for a period of twenty-four (24) months.

21    On August 20, 2003, Mr. Gagnon and Mr. Akerstein met to discuss the exit strategy. Mr.

22    Akerstein informed Mr. Gagnon that AMS had not made any overture or offers to Mr. Gagnon's "guys,"

23    stating "we respect your position." Mr. Akerstein memorialized his statement in writing. (**Exhibit I.**)

24    Prior to Mr. Akerstein's statements here, on August 12th AMS had already sent an email to Mr. Computer

25    employees offering employment opportunities with AMS. ( **Exhibits J.**)

26    Mr. Gagnon and Mr. Akerstein continued to negotiate the terms of an Outside Vendor Agreement

27    originally drafted by Mr. Gagnon and then reviewed with redline comments by Mr. Akerstein and then

28    sent back to Mr. Gagnon.  In the copy returned to Mr. Gagnon, Mr. Akerstein represented that even after

1   the termination of the agreement, AMS would not solicit Mr. Gagnon's employees for a period of one

2   year. (**Exhibit K.**) On August 28th, Mr. Gagnon inquired of Mr. Akerstein if there was any news with

3   respect to the proposed Outside Vendor Agreement.  Mr. Akerstein replied by saying "none yet;"

4   implying that the matter was still being considered.  (**Exhibit L.**)

5           Sometime in August, AMS had hired Mack Barclay Inc. which forensically examined several of

6   Mr. Gagnon's employee's development computers at AMS.  Brian Shaul was allegedly a consultant for

7   Mack Barclay who was hired around the same time.  It was represented to Mr. Gagnon and others that

8   Mr. Shaul was hired at the request of The Metcalfe Estate to handle on going Estate matters.  Mr. Shaul

9   was actually brought into AMS as a consultant to review Mr. Gagnon's programs and interview his

10  employees for employment with AMS.  Mr. Shaul assisted in establishing the hourly rate each employee

11  was to be paid and what duties they would perform as employees for AMS.

12          During the early part of September 2003 and prior to the termination of Mr. Gagnon's services,

13  AMS payroll accounts for several of Mr. Gagnon's employees were created.  Mr. Gagnon's employees

14  were hired by AMS prior to Mr. Gagnon's termination and began working as early as the very next day.

15  During this time AMS's counsel, Higgs, Fletcher & Mack was communicating directly with Mr.

16  Gagnon's Employee's attorney, Terrence Greene regarding their employment with AMS.  Prior to Mr.

17  Gagnon's termination, Mr. Greene, in a letter referenced "Mr. Computer adverse Ian Skuby, et al.,

18  provided AMS' counsel a variety of documents, including the employee's work agreement and Mr.

19  Gagnon's September 15, 2003 daily source code backup memorandum. (**Exhibit M.**)

20          Mr. Gagnon's services were terminated on September 23, 2003. Seven of Mr. Gagnon's

21  employees began working with AMS days of his termination.  Mr. Skuby started for AMS the very next

22  day.  At some point shortly after Mr. Gagnon's termination, Mr. Shaul was then hired by AMS to be in

23  charge of AMS' IT department.  Mr. Akerstein, at his deposition, stated that he and Mr. Shaul despite

24  having full knowledge of this litigation, developed a policy to purge the stored emails from the AMS

25  email exchange server. When asked what they did with the emails, Mr. Akerstein stated, "remove them."

26  (**Exhibit O,** 63-65: 1-28.)All email communication between AMS and Mister Computer personnel were

27  destroyed, subsequent to AMS' initiation of this litigation.

28

1   AMS now claims ownership of the M.C. Programs Via a Vendor Nondisclosure Agreement that
2   suddenly appeared roughly six months after this litigation began.  At this point, Mr. Gagnon will refrain
3   from further comment regarding the procedural posture of this matter do to the extensive record already
4   brought before the Court.

5   ### III.

6   ### LEGAL STANDARD FOR SUMMARY JUDGMENT

7   "A motion for summary judgment provides a procedure for terminating actions without trial when
8   there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a
9   matter of law.  (F.R.Civ.P., Rule 56(c).)  A motion for summary judgment pierces the pleadings and puts
10  the opponent to the test of affirmatively coming forward with sufficient evidence for its claims or
11  defenses to create a genuine issue for trial. *Celotex Corp.* v. *Catrett* (1986) 477 U.S. 317, 325.)  It is not
12  the province of the District Court to weigh or "spin" evidence in the moving party's favor when
13  evaluating a motion for summary judgment. To the contrary, all inferences must be drawn in favor of the
14  non-moving party. (*Dominguez-Curry v. Nev. Transp. Dep't*, (9th Cir. 2005) 2005 U.S. App. LEXIS
15  19764)

16  ### IV.

17  ### ARGUMENT

18  **1.      As The Author of The M.C. Programs, Mr. Gagnon Owns The Copyright to the Programs.**
19  Before addressing AMS' contentions, a brief discussion of the copyright framework is
20  appropriate. 17 USCS § 201 dictates who owns the copyrights to original works. Sec. 201(a) states the
21  initial ownership of a copyright in a work protected under this title vests initially in the author of the
22  work. The authors of a joint work are co-owners of copyright in the work.  Sec. 201(b) states in the case
23  of works made for hire, the employer or other person for whom the work was prepared is considered the
24  author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written
25  instrument signed by them, owns all of the rights comprised in the copyright.
26  / / / / /
27  / / / / /
28  / / / / /

A.    **Mr. Gagnon Was an Independent Contractor To AMS and As Such, His Programs Cannot Be Considered Works Prepared By an Employee in The Scope of Employment.**

There is no question with respect to who authored the programs. All programs and source code were created by Mr. Gagnon and/or his employees. AMS has not identified or alleged that any of its employees authored the source code and/or the programs. In fact, Mr. Akerstein, AMS' COO is unaware of any person directly employed by AMS during the relevant time period that was capable of programming.

Therefore, the relevant inquiry in this context is whether or not the copyright to the programs remains vested in Mr. Gagnon as the author, or are the programs to be considered works for hire, vesting all copyrights in the programs in AMS pursuant to Sec. 201(b).

17 USCS § 101 in relevant part states:

A "work made for hire" is--

(1) a work prepared by an employee within the scope of his or her employment; or

(2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire. ...

It is uncontested that Mr. Gagnon was a consultant to, and not an employee of AMS. The original agreement between AMS and Mr. Gagnon was a technical services agreement (**Exhibit G.**) in which Mr. Gagnon was identified as the consultant and Rick Metcalf, AMS' Founder, was identified as the Contractor. The agreement became effective on May 1, 2000 and terminated on April 30, 2001. During this time Mr. Gagnon created three programs; Production Entry – put in service at AMS in July of 2000, Territory Administration System (TAS) - put in service at AMS in April of 2001, and TeleACT!/Logix (later to be called just "TeleLogix") – put in service at AMS in April of 2001.

The agreement was not renewed, but Mr. Gagnon continued to provide technical services in the same manner through September 23, 2003. During this time Mr. Gagnon maintained his own offices and hired additional employees that assisted in the work done for AMS. Mr. Gagnon had written

1   employment contracts and paid all applicable payroll taxes for those employees[2]. (**Exhibit E.**) Mr.

2   Gagnon's status as a non-employee is further established by AMS' repeated attempts to convince Mr.

3   Gagnon to become an AMS employee.  (See declaration of Mr. Akerstein Filed with AMS' MSJ.) As a

4   result of the foregoing, none of the programs cannot be considered to have been completed by an

5   employee within the scope of employment as defined in sec. 101(A)(1).

6   **B.      Mr. Gagnon's Programs Were Not Specially Ordered For Use In Any of The Enumerated Categories Contained in 17 U.S.C.S § 101 (A)(2).**

7       The programs cannot be considered works for hire as defined by sec. 101(A)(2) either. The

8   programs were not "specially ordered or commissioned" for use in any of the enumerated categories

9   contained sec. 101(A)(2)

10      The programs cannot be considered works for hire as defined by sec. 101(A)(2) either. The

11  programs were not "specially ordered or commissioned" for use in any of the enumerated categories

12  contained sec. 101(A)(2), nor was there any agreement in the form of a written instrument that designated

13  the programs as a work made for hire.  AMS cannot offer any physical evidence in this context because it

14  simply does not exist.  When Mr. Akerstein was questioned about this issue at his deposition, he stated he

15  had nothing in writing. (**Exhibit O; 112, 113:1-23.**)  In contrast, Mr. Gagnon has produced documents

16  demonstrating that the programs were his original concepts to help AMS meet its business needs.

17  (**Exhibit F.**)

18      Several courts have considered similar situations and found that programs created by a consultant

19  to meet business needs of customer is not work for hire giving customer ownership or co-ownership of

20  work. (*Whelan Associates, Inc. v Jaslow Dental Laboratory, Inc.* (1985, ED Pa) 609 F Supp 1307)

21  Program written by free lance programmer is properly held not work for hire. (*Graham v James* (1998,

22  CA2 NY) 144 F3d 229). Programmer was otherwise independent contractor, and company's vague right

23  to assign projects to programmer was similar to its treatment of other independent contractors. (*Alcatel*

---

2      AMS does not address the work for hire issue directly in its motion, but rather intimates in footnote 3 of its motion
that it is applicable at least to Mr. Gagnon's employees. AMS states, "… [Mr. Gagnon's employees] were previously under
AMS' control, as members of AMS' IT staff and, accordingly, should be considered AMS' employees at all relevant times
under the 'work for hire' doctrine." To the extent AMS may attempt to argue this in the context of its copyright claim, the
argument has previously been rejected by the United States Supreme Court in *Community for Creative Non-Violence v. Reid*,
490 U.S. 730,  The Court held that the term employee in the context of copyright was to be defined according to general
agency principals.

1  *USA, Inc. v Cisco Sys.* (2002, ED Tex) 239 F Supp 2d 645.)

2       With a basic understanding of the copyright framework, it is easily determined that Mr. Gagnon

3  owns the copyright to the programs. AMS' failure to address the ownership of the copyright in the

4  statutory context is in effect recognition of the presumptive validity of Mr. Gagnon's copyright claim.

5  AMS must therefore defend its use of Mr. Gagnon's copyrighted works by claiming Mr. Gagon either

6  transferred his copyright to AMS or granted AMS an implied license. AMS attempts to do this in its first

7  Argument.

8  **2.    Mr. Gagnon Did Not Assign or Transfer His Copyright to AMS.**

9       AMS asserts that Mr. Gagnon transferred his copyright to AMS when he allegedly signed the

10  Vendor Nondisclosure Agreement lodged by AMS as Exhibit 7. Mr. Gagnon contests the authenticity of

11  this agreement which in itself raises a triable issue of fact. Alternatively, Mr. Gagnon asserts *arguendo*,

12  that even if the agreement could be authenticated, it does not comply with the requirements of 17 USCS

13  Sec. 204(a) to be considered a valid instrument of conveyance of his copyright to AMS.

14      **A.    There is Undisputable Evidence And Suspicious Circumstances Surrounding The
Creation of The Vendor Nondisclosure Agreement Allegedly Signed By Mr. Gagnon

15         Creating Genuine Issues of Material Fact.**

16
17       Mr. Gagnon contests the authenticity of the Vendor Nondisclosure Agreement and contends that

the signature contained therein is a forgery. In anticipation of Mr. Gagnon's contentions here, AMS has

18  speculated that he will claim that "AMS fraudulently created the Vendor Nondisclosure Agreement after

19  this lawsuit was filed, and then forged Mr. Gagnon's signature on the agreement. ..." AMS concludes by

20  stating, "the undisputed facts show that the Nondisclosure Agreement is genuine, and that Mr. Gagnon's

21  baseless allegation of fraud must be rejected." (**MSJ** 8:12-22.) Mr. Gagnon's does not claim that the

22  agreement was created after this lawsuit was filed. He simply argues that the agreement is a forgery and

23  the circumstances surrounding its existence at a minimum create a genuine issue of material fact.

24  Whether the forgery was created after the lawsuit was filed, in anticipation of the lawsuit, or for some

25  other purpose not known to Mr. Gagnon, is inconsequential at this time.

26       Mr. Gagnon also takes issue with AMS' characterization of certain facts as "undisputed" in an

27  attempt to "show that the Nondisclosure Agreement is genuine... ." (**MSJ** 8:21-22.) AMS first claims

28  that its CFO (Wayne Talleur) confirms that the agreement has existed for years. AMS then Claims that it

1   inventoried its confidentiality agreements shortly after its founder's death in 2002, which corroborates
2   that the signed agreement has existed for years. AMS overstates the significance of Mr. Talleur's
3   statements and AMS' inventory of its confidentiality agreements.  The confirmation that AMS relies on
4   by Mr. Talleur is based on the fact that Mr. Talleur is now responsible for the nondisclosure agreements
5   and keeps a list of such agreements, updating it each time he receives a new agreement.  Mr. Talleur in
6   his declaration in support of AMS' motion states that within two to four weeks of his employment with
7   AMS on October 16, 2002, he received a file containing eleven (11) signed Vendor Nondisclosure
8   Agreements, including the agreement dated June 12, 2002 signed by Kevin Gagnon. He received these
9   agreements from Dave Kesner, AMS' former controller. Mr. Talleur then states he prepared a
10  chronological list of "these" agreements on his computer at AMS and updated the list as new agreements
11  were received.  Mr. Talleur further states that he has hard copies of this list dating back to March 14,
12  2003.

13          Mr. Talleur's maintaining the list of the nondisclosure agreements does not confirm the
14  agreement has existed for years prior to this dispute. It only raises the possibility that as of March 14,
15  2003 he had in his possession an agreement allegedly signed by Mr. Gagnon; three months prior to when
16  the dispute began, and six months prior to the beginning of the litigation.

17          Mr. Talleur states it is his standard practice to "supplement the list upon receipt of a new
18  agreement, to date and save the updated List as a new document, on [his] computer, to delete the previous
19  List, and then print the updated List and keep it with the signed agreements." The circumstances
20  surrounding this list raise some serious questions as to the reliability of his records. If Mr. Talleur began
21  creating this list when he first received the agreements in mid November 2002, where are the original list
22  and the subsequent updates prior to March 4, 2003?  Why delete the previous list and create a new
23  document, when it would be easier to simply save the changes, and at the same time automatically keep a
24  record of when the document was originally created?

25          Mr. Talleur makes reference to the AMS Due Diligence Check List that indicates as of October 3,
26  2002 AMS had in its possession nine (9) signed Vendor Nondisclosure Agreements which he claims is
27  consistent with his list in which Mr. Gagnon's agreement is one of the nine.

28          Looking at Mr. Talleur's list dated March 4, 2003, it appears he makes a compelling argument.

1    The first nine agreements, including the one allegedly signed by Mr. Gagnon, are all dated prior to

2    October 3, 2002 giving some credibility to the AMS Due Diligence List. Agreements numbered ten and

3    eleven on the list are dated October 10, 2002 and October 2002 respectively. This tends to corroborate

4    Mr. Talleur's declaration in which he states he received eleven (11) Vendor Nondisclosure Agreements

5    within to two to four weeks of the date he started work for AMS on October 16, 2002. Mr. Talleur would

6    have received these eleven agreements sometime in the early or mid part of November 2002. Again, his

7    reasoning appears compelling.

8        Unfortunately for Mr. Talleur, *there is undisputable evidence that makes his assertions here*

9    *physically impossible.* Specifically, the agreement signed by Emil Iannaccone, Consultant; listed as

10   number eleven on his list was not received by AMS until January 29, 2003, at least two months after Mr.

11   Talleur claims to have received it. The agreement was faxed to AMS and the confirmation on the top of

12   each page indicates a receipt date of January 29, 2003. The agreement has been lodged with the court as

13   (**Exhibit R.**) This single undisputable fact alone calls into question Mr. Talleur's assertions here and

14   raises material issues of fact as to the credibility and veracity of these assertions. Mr. Kesner's

15   declaration in support of this opposition casts further doubt on the statements of Mr. Talleur. Mr. Kesner

16   states that during his tenure as the custodian of these records, he did not receive a Vendor Nondisclosure

17   Agreement signed by Kevin Gagnon. When he relinquished control of the file containing eleven (11)

18   signed Vendor Nondisclosure Agreements to Wayne Talleur, the file did not contain any agreement

19   signed by Mr. Gagnon. Mr. Kesner recalls the last agreement he received from Mr. Akerstein was

20   signed by Michael Midlam on behalf of AMS.

21       There is one point both Mr. Kesner and Mr. Talleur agree on and that is Mr. Kesner turned over a

22   file containing eleven (11) signed Vendor Nondisclosure Agreements to Mr. Talleur. *This is another*

23   *undisputed fact*. Mr. Talleur not only confirms this fact in his declaration in support of AMS' motion

24   here, but also confirms it in his declaration, dated March 12, 2004 in support of AMS' motion for

25   preliminary injunction. (**Exhibit P.**)

26       It has been conclusively established above that Mr. Talleur's recollection of events is physically

27   impossible; the 11th agreement on his list which he claims is one of the original eleven received, was not

28   received by AMS until January 29, 2003. So how could Mr. Talleur have received eleven agreements

1    from Mr. Kesner?   The answer is really quite simple and can be gleaned from the signed Vendor

2    Nondisclosure Agreements contained in AMS' file.

3          As part of discovery, Mr. Gagnon requested all Vendor Nondisclosure Agreements be turned over

4    for inspection.   AMS complied by providing documents labeled AMS 001319 through 001440.   The

5    agreements numbered 1 through 11 on Mr. Talleur's list were included in those documents.   Also

6    included in those documents are what appear to be duplicate copies of signed agreements numbered 2 and

7    5 on Mr. Talleur's list.   (**Exhibit S.**)   Unfortunately, the existence of these two additional agreements

8    does not help Mr. Talleur's inaccurate recollection of events.   Adding these two agreements to the ten

9    agreements on Mr. Talleur's list that possibly could have been received from Mr. Kesner would give a

10   total of twelve agreements; still inconsistent with the undisputed fact Mr. Talleur originally received

11   eleven agreements from Mr. Kesner.

12          The reality is that these two agreements corroborate Mr. Kesner's statements.   Mr. Kesner stated

13   that when he relinquished control of the agreements there were eleven signed agreements and there was

14   no agreement signed by Mr. Gagnon.   Taking the agreement allegedly signed by Mr. Gagon from Mr.

15   Talleur's list, and adding the two additional agreements brings the total number of agreements to exactly

16   eleven. *It is remarkable how the truth can always be squared the facts.*

17          Furthermore, with respect to the Due Diligence Check List referenced by Mr. Talleur, there are

18   issues of material fact surrounding the way in which the information was compiled. Mr. Akerstein stated

19   in his deposition (lodged as **Exhibit 4**) that he compiled certain information contained in the check list.

20   He stated he ascertained the number of signed Non Vendor Disclosure Agreements by simply calling Mr.

21   Kesner who provided him with the information.   This is not accurate. Mr. Kesner in his declaration

22   (lodged as **Exhibit 5**) in support of this opposition states that he did not provide this information to Mr.

23   Akerstein nor did he even speak with Mr. Akerstein about the Due Diligence Check list. (**Exhibit O,**

24   190:1-10.) The inconsistencies here create additional material issues of fact surrounding the genuineness

25   of the agreement allegedly signed by Mr. Gagnon.

26          What is curious about Mr. Akerstein's representations here is that it appears the information with

27   respect to Vendor Nondisclosure Agreements was readily available to him as of October 3, 2002.   The

28   same for Mr. Talleurs's statements.   He indicate that as early as November 2002, he had a list prepared

1  containing all of the names of the vendors that had signed an agreement.  Mr. Talleur stated at his

2  deposition that in March of 2004, AMS' Chief Information Officer, Brian Shaul came to him looking for

3  a copy of the Vendor Nondisclosure Agreement signed by ADVO, Inc.  It was at that point "we noticed

4  on our list and in the file a vendor nondisclosure agreement for Mr. Gagnon, Mister Computer."  It all

5  seems so easy and organized; the information at there fingertips.

6       Why then did AMS' counsel, Mr. Samouris in his declaration dated March 10, 2004 represent to

7  this Court that AMS "searched" its records and delay in locating the agreement was excusable because

8  AMS' founder, Richard M. Metcalf died in a boating accident in summer of 2002 and AMS moved

9  offices shortly thereafter, in August of 2002?  Mr. Samouris made it sound like AMS had been searching

10  for these agreements for some time and had difficulty locating them because of the tragedy of Mr.

11  Mecalfe's death and the chaos of the move a year earlier.

12       What is even more curious is why didn't anybody know anything about this agreement prior to

13  March 2004, nearly six months after this litigation began?  There were negotiations regarding an exit

14  strategy that involved discussions about who owned the copyright to the programs. Yet not one person at

15  AMS ever thought to ask, did Kevin Gagnon sign a Vendor Nondisclosure Agreement?  This agreement

16  wasn't even discovered until it was allegedly stumbled upon when Mr. Shaul was looking for a different

17  agreement.

18       Mr. Akerstein stated at his deposition that he did not know the agreement existed.  Mr. Akerstein

19  committed his thoughts with respect to his negotiations with Mr. Gagnon to writing in a document he

20  called his "talking points" for a meeting with Mr. Gagnon. The document is dated June 30, 2003. and

21  (**Exhibit I.**)  On the second page under the heading Software-Custom built, there are question marks next

22  to the ownership and licensing points.  One would think that Mr. Akerstein would have thought or

23  questioned at that time if Mr. Gagnon had signed a Vendor Nondisclosure Agreement which would have

24  been the company's routine policy.  As part of these negotiations Mr. Gagnon prepared a proposed

25  Outside Vendor Agreement and presented it to Mr. Akerstein for review.  Mr. Akerstein reviewed the

26  proposed agreement and sent a red-lined version of it back to Mr. Gagnon.  Again, one would think that

27  during this process Mr. Akerstein would have remembered or questioned if Mr. Gagnon had signed a

28  Vendor Nondisclosure agreement previously.

1    What makes the foregoing even more incredible is that Mr. Akerstein is now the person who

2    claims to have created the document and recalls the circumstances in which the agreement was signed.

3    He explains in his declaration in support of AMS' motion that he simply forgot about it. Despite being in

4    litigation over the very issues that the Vendor Nondisclosure Agreement was created to prevent and

5    preparing five additional agreements for various vendors to sign during this dispute, Mr. Akerstein

6    simply had "forgotten" Mr. Gagnon had signed such an agreement. Mr. Akerstein has a credibility

7    problem.

8    As Mr. Gagnon contends, there are unresolved issues of material fact surrounding the existence of

9    the Vendor Nondisclosure Agreement allegedly signed by Mr. Gagnon. Consequently, in cannot be said

10    that the agreement is genuine as a matter of law.

11    **B.    The Alleged Signature of Mr. Gagnon on The Vendor Nondisclosure Agreement Cannot Be Authenticated.**

12    AMS makes one last feeble attempt to support its contention that the Vendor Non Disclosure

13    Agreement allegedly signed by Mr. Gagnon is genuine. AMS states, "Mr. Gagnon's understanding of the

14    parties' arrangement is consistent with the terms of the Vendor Nondisclosure Agreement. Thus, Mr.

15    Gagnon naturally signed it." AMS' contentions here only demonstrate it has no witness that can attest to

16    Mr. Gagnon signing the agreement. These contentions cannot authenticate his signature.

17    After the Vendor Nondisclosure Agreement allegedly signed by Mr. Gagnon was discovered, it

18    was examined by Mr. Gagnon's forensic document examiner Sandra L. Homewood who then conferred

19    with AMS' forensic document examiner David Oleskow. Ms. Homewood concluded that the signature

20    in the agreement could not be authenticated as Mr. Gagnon's. Mr. Oleskow confirmed Ms. Homewood's

21    conclusion when they met with the approval of both Mr. Gagnon and AMS and he stated to her that

22    "nobody could identify the signature." A copy of Ms. Homewood's laboratory report is lodged as

23    **Exhibit 6.** The conclusions of Ms. Homewood and Mr. Oskelow raise additional issues of material fact.

24    Again, looking at the evidence in a light most favorable to Mr. Gagnon, the Vendor Nondisclosure

25    Agreement cannot be found by the Court to be genuine as a matter of law.

26    / / / / /

27    / / / / /

28    / / / / /

3.   **Assuming *Arguendo*, The Court Finds The Vendor Nondisclosure Agreement To Be Genuine, The Agreement's Effective Date Precludes it From Being a Transfer of Mr. Gagnon's Copyright Pursuant To 17 U.S.C.S. § 204(a)**

17 USCS §. 201(d) dictates that the ownership of a copyright may be transferred by any means of conveyance or operation of law.  Sec. 204(a) states a "transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent."   The 9th Circuit has consistently found copyright license agreements invalid that have not complied with § 204(a). (*Radio TV Espanola S.A. v New World Entertainment, Ltd.* (9th Cir. 1999), 183 F.3d 922, 926-927;  See also Konigsberg Int'l. Inc. v. Rice (9th Cir. 1994), 16 F.3d 355, 356-57 ; *Effects Assocs., Inc. v. Cohen* (9th Cir. 1990), 908 F.2d 555, 556-58 *Valente-Kritzer Video v. Pinckney* (9th Cir. 1989), 881 F.2d 772, 775.)

The parties' intent, as evidenced by the writing must demonstrate a transfer of the copyright. (*Valente-Kritzer*, 881 F.2d at 775.) "The writing should also serve as a guidepost for the parties to resolve their disputes." (*Konigsberg*, 16 F.3d at 357.)  Section 204 ensures that the creator of a work will not give away his copyright inadvertently and forces a party who wants to use the copyrighted work to negotiate with the creator to determine precisely what rights are being transferred and at what price. (*Cf. Community for Creative Non-Violence v. Reid*, 490 U.S. 730, Most importantly, section 204 enhances predictability and certainty of copyright ownership - "Congress' paramount goal" when it revised the Act in 1976. *Cf. Community for Creative Non-Violence*, 109 S. Ct. at 2177; see also *Dumas v. Gommerman* (9th Cir. 1989), 865 F.2d 1093, 1103-04.)

There were no written agreements between AMS and Mr. Gagnon with respect to the nature of the services to be provided by Mister Computer from May 2001 through September 2003.  However, AMS alleges that Mister Computer executed a Vendor Nondisclosure Agreement in which Mister Computer among other things acknowledged that any copyrightable works that directly resulted from the disclosure of confidential information by AMS would be the property of AMS.  Again, Mister Computer contests the authenticity of this agreement.  Should the document be found authentic, it still does not qualify as a valid transfer of copyright pursuant to Sec. 204.

The relevant portion of the document is located in Section 6, paragraph b). Paragraph b) states "Receiving Party agrees that all inventions, improvements, designs, trademarks, copyrightable works, relating to machines, methods, compositions, products or services of [AMS] directly resulting from or relating to the Confidential Information and the right to market, use, license and franchise the Confidential Information of the ideas, concepts, methods or practices embodied therein shall be the exclusive property of [AMS] and the receiving Party has no right or title thereto. The document states in Section 9 the "agreement shall commence on the date first written above" which is June 12, 2002.

The agreement here is no more than a contract of adhesion, a standardized contract, drafted by a party of superior bargaining strength, that relegates to the subscribing party only the opportunity to adhere to the contract or reject it. *Neal v. State Farm Ins. Co.* (Ct. App. 1961), 188 Cal. App. 2d 690.) Mr. Akerstien acknowledged that the agreement was created by his counsel and is a standardized agreement used with all of its vendors. The agreement was created in November of 2001 and based on the number of agreements in AMS' possession, was utilized 6 times prior to Mr. Gagnon allegedly signing a copy.

Three of the programs existed over a year prior to the effective of the agreement, June 12, 2001; Production Entry – put in service at AMS in July of 2000, Territory Administration System (TAS) - put in service at AMS in April of 2001, and TeleACT!/Logix – put in service at AMS in April of 2001 As stated above, Mr. Gagnon as the author owns the copyright to these programs. It cannot be said that this standardized contract of adhesion is in effect conveyance of Mr. Gagnon's copyright in these programs to AMS.

First, the language in Section 6 of the agreement makes no reference to copyrightable works created prior to the effective date of the agreement. The agreement basically states that as of June 12, 2002 any copyrightable works resulting from the disclosure of AMS' confidential information shall be the property of AMS. The language is anticipatory in nature and makes no reference to any works that had already resulted from disclosure, prior to the effective date of the agreement.

As stated above, 17 USCS Section 204 ensures that the author of a work will not give away his copyright inadvertently and forces a party who wants to use the copyrighted work to negotiate with the author to determine precisely what rights are being transferred and at what price. The alleged execution

1   of this contract of adhesion does not comply with section 204 because there is no evidence that the

2   agreement was a result of any negotiations and that AMS identified the programs and the specific rights

3   being transferred; specifically there was no reference to the programs that already existed in which Mr.

4   Gagnon was already the owner of the copyright.

5        Furthermore, these three programs were initially developed under the original Technical Services

6   Agreement entered into between Mr. Metcalf and Mr. Gagnon effective from May 1, 2000 through April

7   30, 2001.  That agreement had no provisions what so ever with respect to copyrightable works and was a

8   negotiation between the parties that reflected their intent at that time.  To interpret the language of this

9   contract of adhesion as writing that demonstrates the party's intent to transfer copyright and that it

10  somehow applies retroactively to the programs created under the Technical Services Agreement would

11  only serve to promote uncertainty and unpredictability with respect to copyright.  This was clearly not the

12  intent of congress when it revised the Copyright Act in 1976.

13       As a result of the foregoing, Mr. Gagnon is the owner of the copyrights to at least the three of the

14  programs created under the Technical Services Agreement; Production Entry, Territory Administration

15  System (TAS), and TeleACT!/Logix.

16

17  **4.    A Finding By This Court Granting AMS An Implied License to Use Mr. Gagnon's
    Programs Would In Effect Be Granting AMS A License to Steal.**

18

19       AMS in the second part of its first argument states that "[a]t a minimum, AMS has an implied

20  license to possess, use and modify the source code for the AMS support programs to operate its business.

21  AMS relies primarily on three cases to support its position; *Effects Associates, Inc. v. Cohen* (9th Cir.

22  1990), 908 F. 555, *Foad Consulting Group, Inc. V. Musil Azzalino* (9th Cir. 2001) 270 F.2d, 821, and

23  *I.A.E., Inc. v. Shaver* 74 F.3d 768.  As summarized by the court in I.A.E., 74 F.3d 768, these cases

24  stand for the proposition  that  an implied license should be recognized when 1) the licensee requests the

25  creation of a specific work, 2) the licensor creates the work and delivers a copy of the work to the

26  licensee, and 3) the licensor intends that the licensee copy and distribute the work. (*Id.* at 776.)  In each of

27  the cases cited by AMS an implied license was granted because all three criteria where met.   All of the

28  licensees had contracted for specific works that were created by the licensor with copies being delivered

1 | to the licensee.  It could be determined from the circumstances that the licensor intended for the copies of
2 | the work to be distributed.

3 |       In the case at bar, AMS never specifically requested or contracted for Mr. Gagon to create a
4 | specific computer program.  Mr. Gagnon would create programs as he deemed necessary to meet AMS'
5 | business needs and periodically provide his concepts to AMS management in their weekly meetings.
6 | (**Exhibit F.**)  The programs were not created by Mr. Gagnon as the result of any specific request by
7 | AMS.  Mr. Gagnon never delivered a copy of the programs to AMS directly.  Rather, certain executable
8 | files were installed on AMS' server by Mr. Gagnon and his employees that allowed AMS utilize the
9 | programs under the control of Mr. Gagnon and his employees. Mr. Gagnon and his employees were the
10 | only individuals that were capable of changing the programs do to the fact that they controlled the source
11 | code to the programs. There were no floppy disks or CD's containing the program files for AMS to
12 | distribute.  Nor were there any user manuals created for the software. Furthermore, Mr. Gagnon notified
13 | AMS that the programs were not to be distributed by publishing his copyright notice in a splash screen
14 | each time a program was utilized. (**Exhibits A and B.**)

15 |       In *Foad*, the case AMS relies most heavily in its argument, the plaintiff Foad Consulting Group,
16 | was an engineering firm that provided engineering plans to a developer, GenCom for development of a
17 | specific piece of property.  GenCom had contracted with Foad for a specific Concept Development Plan.
18 | Foad created the plan and delivered the plan to the GenCom. GenCom then transferred its rights to
19 | another developer which resulted in another engineering firm, MGA finishing the project utilizing Foad's
20 | original work.  Foad then filed its copyright infringement claim against MGA.  MGA moved for summary
21 | judgment and the District Court granted the motion finding an implied license.  The Ninth Circuit upheld
22 | the District Court's ruling based on the legal standard detailed above.  AMS relies on *Foad*  because the
23 | plaintiff there attempted to rely on a notice and/or legend on the plans prohibiting unauthorized future use
24 | of them.  The legend Stated:  All ideas, designs, arrangements and plans indicated or represented by this
25 | drawing are owned by, and the property of Foad Consulting Group, Inc. and were created, evolved and
26 | developed for use on, and in connection with the specified project. None of such ideas, designs,
27 | arrangements or plans shall be used without written permission of Foad Consulting Group, Inc.  The
28 | Court rejected this notice not because the notice in and of itself was inadequate, but rather notice was

1  incorporated in the plans by plaintiff and not contained in the original contract.  One would have

2  expected such a limiting notice would have been in the contract if it were the parties intent. (*Foad*, 270

3  F.3d at 828,829.)

4       The facts in this case are clearly distinguishable from those in Foad. There is no written contract

5  with respect to the creation of the programs.  The only uncontested writing as to the parties understanding

6  of the copyright is the copyright notice contained in the programs themselves, published to AMS every

7  time one of the programs was utilized by AMS.  One would think that if AMS truly believed it owned the

8  software programs, it would have objected to Mr. Gagnon's copyright notice, but it did not.

9       AMS attempts to mischaracterize everything Mr. Gagnon says in an attempt to demonstrate that it

10  was Mr. Gagnon's belief that AMS had a non-exclusive license to his programs.  For example AMS

11  states, "[l]ikewise, Mr. Gagnon [sic.] last proposed Professional Services Agreement in June of 2003

12  states that 'contractor [Mr. Gagnon] will allow Company [AMS] non-exclusive unlimited licensing of

13  software developed for Company.' In fact, Mr. Gagnon states in his declaration of March 18, 2004, that

14  Article 7 of this proposed agreement set forth his 'understanding of the relationship between the parties

15  as of June 2003." (**MSJ** 14:20-24.)

16       A quick read of the first line of Article 7 of the agreement demonstrates AMS'

17  mischaracterization here.  It reads, "Client agrees that all designs, plans specifications, drawings,

18  inventions, processes, and other information or items produced by Contractor while performing services

19  under this agreement will be the property of the Contractor and will be licensed to Client on a non-

20  exclusive basis as will any copyrights, patents or trademarks obtained by contractor while performing

21  services while performing services under this agreement."  Mr. Gagnon also lays claim to all intellectual

22  property in Article 7.

23       To understand Mr. Gagnon's position her one need only look to the letter Mr. Gagnon sent Mr.

24  Akerstein dated August 5, 2003.  In the section entitled Intellectual Property, Mr. Gagnon clearly states

25  that his "position has always been that Asset marketing Systems shall be entitled to unlimited software

26  licensing as long as my company had a business relationship with Asset Marketing Systems."

27  (**Exhibit H.**)

28

1     AMS attempts to make an issue with respect the programs being on AMS computers and this

2     conduct some how supports a non-exclusive implied license.  AMS once again overstates the significance

3     of the facts.  The programs were located on computers in the development room at AMS, utilized by MR.

4     Gagnon and his employees. Access to the Development Room was tightly controlled and could be

5     monitored through a Honeywell™ Security Card Access System.  The only persons with access to this

6     room were my employees and a select group of AMS' upper management.  As Mr. Gagnon trained each

7     software developer to modify the source code he would relinquished a copy to each, knowing that he had

8     a work agreement in place to protect his intellectual property and trade secrets. (See declaration of Kevin

9     Gagnon.)  Once the source code was compiled and ready to be installed on a computer system for use at

10    AMS as a program, either Mr. Gagnon or one of my employees would have to perform this task.

11    Depending on the software program, this process could be extremely involved.  AMS never had a copy of

12    an installation disk, instruction manual, or any other media that would facilitate this process.

13        The mere existence of the programs on the server would not have compromised the security of

14    Mr. Gagnon's programs if AMS had not interfered with Mr. Gagnon's employee relationships and hired

15    his employees away prior to the termination of Mr. Gagnon's service.  The programs themselves that

16    resided on the server were compilations of the source code that created an executable program file.  If

17    someone were attempt to open the executable files, all that they would see is an undecipherable series of

18    random characters representing zeros and ones.  AMS itself could not have modified the programs with

19    out the programming source code which was not openly on the AMS server. That source code was in the

20    possession of Mr. Gagnon and his employees.

21        In Mr. Gagnon's letter dated August 5, 2005 addresses the employee issue. On August 20, 2003,

22    Mr. Akerstein responds by stating, "I want to be clear that we have made no overture or offers to your

23    guys, we respect your positon." **(Exhibit I.)**   Mr. Akerstein makes this representation despite his

24    company's email to a certain few of Mr.Gagnon's employees on August 12, 2003 offering positions for

25    programmers.  Mr. Akerstein's misrepresentation to Mr. Gagnon is further demonstrated by the

26    declaration of Mr. Kesner in which he states that During the early part of September 2003 and prior to the

27    termination of Mr. Gagnon's services, I was instructed to create AMS payroll accounts for several of Mr.

28    Gagnon's employees. Mr. Kesner was aware that Mr. Shaul was first brought into AMS as a consultant

1  to review Mr. Gagnon's programs and interview his employees for employment with AMS.  Mr. Shaul

2  assisted in establishing the hourly rate each employee was to be paid and what duties they would perform

3  as employees for AMS.

4     Furthermore, during this time AMS's counsel, Higgs, Fletcher & Mack was communicating

5  directly with Mr. Gagnon's Employee's attorney, Terrence Greene regarding their employment with

6  AMS.  Prior to Mr. Gagnon's termination, Mr. Greene, in a letter referenced "Mr. Computer adverse Ian

7  Skuby, et al.,  provided AMS' counsel a variety of documents, including the employee's work agreement

8  and Mr. Gagnon's September 15, 2003 daily source code backup memorandum. (**Exhibit M.**)

9     The point here is that the conduct of AMS' management demonstrates that they themselves did

10  not believe they had an implied license to use Mr.Gagnon's programs. They took it upon themselves to

11  misrepresent their intentions to Mr. Gagnon in order to make time for them to hire his employees and

12  misappropriate his programming source code.  All of these decisions were made to ensure AMS took

13  control of Mr. Gagnon's software programs without his knowledge and/or his consent.

14     A finding by the court, giving AMS an implied license would in effect condone AMS' wrongful

15  conduct, granting them a license to steal.

16  **5.     AMS' Remaining Arguments Cannot Be Established As A Matter of Law and Therefore Must Be Rejected in The Context of Summary Judgment.**

17

18     AMS' remaining argument's are all based on the invalid assertion that AMS  either owns the

19  programs in question via the Vendor Nondisclosure Agreement allegedly signed by Mr. Gagnon, or at a

20  minimum, has an implied license to use the programs as a matter of law.  As established above there are

21  genuine issues of material fact that exist.  Drawing all inferences in favor of Mr. Gagnon, the non-

22  moving party, AMS' assertion cannot be established as a matter of law. Therefore, it fails in the context

23  of a motion for summary judgment.  Consequently, so to must the remaining arguments.

24     For example: with respect to Mr. Gagnon's misappropriation of trade secrets claim, AMS

25  concludes, "AMS cannot as a matter of law 'misappropriate' the programs, including any alleged trade

26  secrets, therein, because AMS either owns the AMS Support Programs, or has a broad, implied license to

27  possess, use and modify the source code." (**MSJ**, 18: 18-20.)  The weakness of this argument, as with the

28  remaining arguments is obvious.

1    Drawing all inferences in favor of the non-moving party, Mr. Gagnon, it is a reasonable assertion

2    that AMS has gained in wrongful conduct and has at a minimum misappropriated Mr. Gagnon's

3    programming source code to utilize and modify the M.C. Programs.  Consequently, AMS' arguments

4    with respect to Mr. Gagnon's claim of unfair competition, interference with prospective business

5    advantage, accounting, and declaratory relief must be rejected.  AMS' Motion for Summary Judgment

6    should be rejected in its entirety.

7                                              **V.**

8                                        <u>**CONCLUSION**</u>

9    For the foregoing reasons, Mr. Gagnon hereby respectfully requests that the Court deny AMS'

10   motion for summary judgment in its entirety.

11

12

13   DATED: October _11_ , 200              Respectfully Submitted,
                                            LAW OFFICE OF TODD A. MOORE
14

15

16                                          By:_____
                                            Todd A. Moore, Esq.
17                                          Attorney for Defendants
                                            KEVIN GAGNON, MISTER COMPUTER,
18                                          NATIONAL MARKETING TECHNOLOGIES, INC.

19

20

21

22

23

24

25

26

27

28